# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No.: 19-cv-62408-SINGHAL

PHILIPPE CALDERON and ANCIZAR MARIN, on
behalf of themselves and all others similarly
situated,

       Plaintiffs,

v.

SIXT RENT A CAR, LLC, and SIXT FRANCHISE
USA, LLC,

       Defendants.

_____/

## MEMORANDUM DECISION AND ORDER

Before the Court are two motions: (1) Defendants' Motion to Dismiss Plaintiff
Calderon's Claims and for Oral Argument ("Motion to Dismiss") (DE [11]), and (2)
Defendants' Motion to Compel Arbitration of Plaintiff Marin's Claims, or, Alternatively, For
Limited Discovery Concerning Arbitrability and for Oral Argument ("Arbitration Motion")
(DE [12]). The Court has considered the well-briefed positions by both sides. In so doing,
the Court dispenses with oral argument and **DENIES** both motions.

## I.    BACKGROUND[1]

Defendants are Sixt Rent a Car, LLC and Sixt Franchise USA, LLC,[2] together
forming a luxury car-rental company. *See* Compl. ¶ 1 (DE [1]). Plaintiffs form a putative

---

[1] The facts are taken from the Complaint, viewed in the light most favorable to the
plaintiffs, and assumed to be true for the purposes of a motion to dismiss. *See Archer v.
Aldridge Connors, LLP*, 998 F. Supp. 2d 1360, 1361 (S.D. Fla. 2014).

[2] Notwithstanding the corporate formalities, the Court will refer to both named defendants
(Sixt Rent a Car, LLC and Sixt Franchise USA, LLC) collectively as "Sixt," and will refer
to this term as a single entity.

class and file this action against Sixt for allegedly imposing unauthorized, fraudulent charges in violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), *see* Fla. Stat. §§ 501.201–.213, and the Florida Consumer Collection Practices Act ("FCCPA"), *see* Fla. Stat. §§ 559.55–.785. *See* Compl. ¶ 1 (DE [1]). According to Plaintiffs, Sixt has "organized a company-wide scheme to systematically defraud consumers" by "mark[ing] up diminution in value, loss of use charges, engineer fees, and administrative fees/costs, in excess of the actual cost to serve as a profit generator" and charging unauthorized fees like "repair costs for alleged property damages to vehicles, recovery/storage fees, administrative fees, loss of use costs, engineers fees, diminution of value charges, appraisal fees, and dunning charges." (*Id.*).

Two named plaintiffs seek to represent the putative class: Philippe Calderon ("Calderon") and Ancizar Marin ("Marin"). Though separated by roughly three years, their stories are similar; each reserved and rented a luxury car from Sixt and each incurred these unauthorized, fraudulent fees. Their stories, however, differ in one significant way: Calderon made his reservation directly through Sixt's website (*id.* ¶ 49), while Marin made his through Orbitz.com, a third party with whom Sixt contracts and through which Sixt's inventory can be reserved and rented (*id.* ¶ 75). Based on this, Plaintiffs have subdivided their class into various groups.[3] As to the two motions at issue here, the two relevant subclasses are those having made reservations directly through Sixt's website, and those having made reservations through third-party Orbitz. This Order will refer to the former simply as "Calderon" and the latter simply as "Marin."

_____

[3] Because of the early posture of this case, the Court offers no opinion on the propriety of the putative class or the manner in which Plaintiffs propose to subdivide their class.

Again, despite the different manner in which they made their reservations, their stories are otherwise largely identical. This is particularly true for their post-reservation allegations—that is, when they visited Sixt's kiosks to pick up their rental cars and sign the operative agreements.

The Court will present the allegations set forth in the Complaint through the prism of three scenes: (1) the reservation process, where, as stated above, Calderon's and Marin's stories differ; (2) the pick-up process, where their stories are nearly identical, as both signed the same agreements; and (3) the return process, where, again, their stories are largely identical, and both claim unauthorized and fraudulent assessment of fees by Sixt.

### A.    The Reservation Process

#### 1.    Calderon's Reservation Directly Through Sixt's Website

Calderon's reservation was straightforward: On April 1, 2016, he reserved a luxury car directly through Sixt's website, http://www.sixt.com. (*Id.* ¶ 49). After completing and submitting the online form, he received a confirmation email with a reservation number. (*Id.* ¶ 51). This completed the reservation process through Sixt's website.

#### 2.    Marin's Reservation Through Third-Party Orbitz

Marin's reservation was largely the same. However, because he went through a third-party website, his reservation included terms and conditions provided by the third party. In February 2019, he reserved a luxury car from Sixt online through third-party Orbitz.com. *See* Compl. ¶¶ 75, 79 (DE [1]). To complete the reservation process through Orbitz's website, Marin clicked a fairly sizeable red button that borne the words "Reserve

Now" centered inside. *See* Arbitration Mot. 2–3 (DE [12]). Immediately above the Reserve

Now button was the following statement:

> By selecting to complete this booking I acknowledge that I have read and accept the Rules & Restrictions, Terms of Use, Privacy Policy and Government Travel Advice.

*See* Ex. 1 to Arbitration Mot. (DE [12-1]). Each of the capitalized terms (i.e., Rules &

Restrictions, Terms of Use, Privacy Policy and Government Travel Advice) in this

statement were clickable, internet hyperlinks in the traditional, conspicuous blue font to

contrast with the non-clickable black font. (*Id.*). Thus, Marin could open and read each

term and policy. (*Id.*).

When clicked, the hyperlink titled "Terms of Use" opened a pop-up window, which,

in turn, was titled "Orbitz Terms of Use." *See* Ex. 2 to Arbitration Mot. (DE [12-2]). Not

surprisingly, the Terms of Use is a lengthy document with a number of terms with which,

by completing the reservation through Orbitz, the customer represents agreement. (*Id.*).

For purposes of this action, the focus is on the third section in the Terms of Use:

"Disputes." (*Id.*). The arbitration clause contained therein provides, in relevant part:

> Orbitz is committed to customer satisfaction, so if you have a problem or dispute, we will try to resolve your concerns. But if we are unsuccessful, you or we may pursue claims as explained in this section.
>
> To give us an opportunity to resolve informally any disputes between you and us arising out of or relating in any way to the Website, these Terms of Use, our Privacy Policy, any services or products provided, any dealings with our customer service agents, or any representations made by us ("Claims"), you agree to communicate your Claim to Orbitz by contacting Orbitz Customer Support . . . .

You and Orbitz agree that **any and all Claims will be resolved by binding arbitration, rather than in court**, except that you and we may assert Claims on an individual basis in small claims court if they qualify. This includes any Claims you assert against us, our subsidiaries, travel suppliers or any companies offering products or services through us (which are beneficiaries of this arbitration agreement). This also includes any Claims that arose before you accepted these Terms of Use, regardless of whether prior versions of the Terms of Use required arbitration.

(*Id.*).

By completing his online reservation, Marin necessarily clicked all required buttons, indicating he consented to the terms and conditions of all of Orbitz's policies. (*See id.*). Like Calderon, when Marin completed his reservation, he received a confirmation email with a reservation number from Sixt. *See* Compl. ¶ 76 (DE [1]).

### B.    The Pick-Up Process and the Rental Agreement

Calderon picked up his rental from Sixt on April 1, 2016 (*id.* ¶ 53); Marin picked his up on March 5, 2019 (*id.* ¶ 78). Though almost three years apart, their experience picking up their rental cars and signing the operative agreements is nearly identical.

Upon arriving at Sixt's kiosks, they provided their reservation number, submitted their payment information, and produced proof of identity. (*Id.* ¶¶ 53, 78). Sixt's employee instructed each to sign digitally a black electronic signature device indicating that they accepted the terms and conditions of the rental's "Face Page." (*Id.* ¶¶ 54, 79). The Face Page appears simply to be a traditional, elongated paper receipt that any customer would typically receive after making a purchase at any grocery store or the like. Among other basic information found on traditional receipts, the Face Page itemizes charges and fees that, in Calderon's case, added up to $192.69, *see* Ex. C to Compl. (DE [1-5]), and in Marin's case added up to $241.64, *see* Ex. D to Compl. (DE [1-6]). The Face Page also contains several paragraphs' worth of representations to which the customer picking up

their rental car and Sixt both agree. The salient provision here, the Face Page contains the following representation:

> By signing below, you agree to the Terms and Conditions printed on the rental jacket and to the terms on this Face Page, which together constitute this Agreement. You acknowledge that you have been given an opportunity to read this Agreement before being asked to sign it, and that all information you have provided is true and correct.

*See* Compl. ¶¶ 56, 81 (DE [1]); *see also* Ex. C to Compl. (DE [1-5]).

After each Calderon and Marin signed the Face Page, Sixt's employee printed it, folded it, and placed it in a pre-folded paper envelope that contained the keys to the rental car. *See* Compl. ¶¶ 56, 81 (DE [1]). This tri-folded paper envelope is referred to as the "Rental Jacket." Prior to signing the Face Page, neither Calderon nor Marin was informed of the Rental Jacket, provided a copy of it, afforded an opportunity to review it, or given instructions on how to access it. (*Id.* ¶¶ 55, 80).

Unlike the Face Page, the Rental Jacket is a pre-printed document with standard language and used uniformly at all of Sixt's locations. (*Id.* ¶ 23); *see also* Ex. A to Compl. (DE [1-3]). The Rental Jacket is not a receipt; it does not contain individualized and itemized information based on each rental and each customer. *See* Ex. A to Compl. (DE [1-3]). The relevant paragraphs in the Rental Jacket are 5 and 8:

> **5.      Responsibility for Damage or Loss; Reporting to Police; for Tolls and Parking Violations.** You are responsible for all damage to, and for loss or theft of, the Vehicle including damage caused by weather, road conditions and acts of nature, even if you are not at fault. You are responsible for the cost of repair, or the actual cash retail value of the Vehicle on the date of the loss if the Vehicle is not repairable or if we elect not to repair the Vehicle. You are also responsible for Loss of Use (without regard to fleet utilization), Diminished Value, and our administrative expenses incurred processing a claim. You must report all accidents and incidents of theft and vandalism to us and the police as soon as you discover them. You are responsible for paying the charging authorities directly all

parking citations, toll fees, fines for toll evasion, and other fees, fines and penalties assessed against you, us, or the Vehicle during this rental.

. . . .

**8. Charges and Costs.** You will pay us at or before the conclusion of this rental, or on demand, all charges due us under this Agreement, including the charges and fees shown on the Face Page and (a) a mileage charge based on our experience if the odometer is tampered with; (b) any taxes, surcharges or other government-imposed fees that apply to the transaction; (c) all expenses we incur locating and recovering the Vehicle if you fail to return it, return it to a location or office other than the location or office identified by us, or if we elect to repossess the Vehicle under the terms of this Agreement; (d) all costs including pre- and post-judgment attorney fees we incur collecting payment from you or otherwise enforcing or defending our rights under this Agreement; (g) a reasonable fee not to exceed $350 to clean the Vehicle if returned substantially less clean than when rented or if there is evidence of smoking in our Vehicle; and (h) towing, impound, storage charges, forfeitures, court costs, penalties and all other costs we incur resulting from your use of Vehicle during this rental. . .

*See* Ex. A to Compl. (DE [1-3]).

Again, the Rental Jacket is not individualized per customer. (*See id.*). It is a standard form that contains a large number of representations and agreements to which the customer, by signing the Face Page, has already agreed. *See* Ex. C to Compl. (DE [1-5]) ("By signing below, you agree to the Terms and Conditions printed on the rental jacket and to the terms on this Face Page, which together constitute this Agreement."). That Sixt's employee did not provide Calderon or Marin the Rental Jacket prior to them agreeing to its terms is not insignificant. Sixt's policy is to deliver the Rental Jacket to customers only after they have signed the Face Page and agreed to be bound to the terms in both the Face Page and the Rental Jacket. *See* Compl. ¶ 26 (DE [1]).

## C.    The Return Process

Calderon returned his rental car after three days with, as he alleges, "no damage and in the same condition as when the vehicle was first picked up on or around April 1, 2016." *See* Compl. ¶ 63 (DE [1]). Marin returned his rental car after two days with, as he likewise alleges, no damage. (*Id.* ¶ 88). Sixt did not inspect the car when Calderon returned it (*id.* ¶ 64),[4] but eight days later, sent him a letter claiming the car was damaged over $600 in value. (*Id.* ¶¶ 66–68). Five days after Marin returned his car, Sixt sent an email alleging damage and, over a month after that, sent a follow-up email with a collection letter for over $700. (*Id.*¶ 89–91). The charges in each of these collection emails are classified as those from paragraphs 5 and 8 of the Rental Jacket. (*Id.* ¶¶ 69, 92).

The putative class, divided into subclasses, filed a five-count complaint. For Counts I and V, all class members allege a violation of FDUTPA; Count II, Calderon (and those who reserved cars directly through Sixt's website) alleges breach of contract; Count III, Marin (and those who reserved cars through third-party websites) alleges breach of contract; and Count IV, those members of the class who received a collection letter allege a violation of FCCPA. The Court will save class-action and class-certification discussion for another day. At this early stage in the proceeding, Sixt filed the Motion to Dismiss (DE [11]), where they move to dismiss Calderon's claims, and the Arbitration Motion (DE [12]), where they move to compel arbitration on Marin's claims. The Court will discuss each in turn.

---

[4] The Court notes this particular allegation appears only in Calderon's portion of the Complaint. *See* Compl. ¶ 64 (DE [1]). It is not clear, from reading the Complaint, whether this allegation also applies to Marin.

## II.     DISCUSSION ON THE MOTION TO DISMISS

### A.     Legal Standard on a Motion to Dismiss for Failure to State a Claim

"'When evaluating a motion to dismiss under Rule 12(b)(6), the question is whether the complaint contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Worthy v. City of Phenix City*, 930 F.3d 1206, 1217 (11th Cir. 2019) (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Worthy*, 930 F.3d at 1217 (quoting *Iqbal*, 556 U.S. at 678). As briefly stated above, the Court is guided by the well-known principle that, on a motion to dismiss for failure to state a claim, the Court assumes all well-pleaded allegations in the Complaint are true and views them in the light most favorable to the plaintiff. *Jackson v. Okaloosa Cty.*, 21 F.3d 1532, 1534 (11th Cir. 1994).

### B.     Calderon's Claim for Breach of Contract

"To state a valid cause of action for breach of contract, a plaintiff must establish three elements: (1) a valid contract; (2) a material breach; and (3) damages." *Collins v. Certain Underwriters at Lloyd's, London Subscribing to Policy No. B0723AI00342A10*, 2012 WL 13014690, at *2 (S.D. Fla. Apr. 24, 2012) (internal quotation omitted). Of course, it is well known that a valid contract consists of, among other things, "sufficient specification of the essential terms." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009) (citing *St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004)).

The parties do not dispute the existence of a contact; they agree that the governing contract is the "Rental Agreement." What they cannot agree on are "the essential terms" of the Rental Agreement. Calderon argues the Rental Agreement consists of only the Face Page—the only agreement he signed. Consequently, his breach-of-contract claim alleges that Sixt did not have the contractual authority to charge the additional fees because the Face Page did not provide for such fees.

Sixt, on the other hand, insists the Rental Agreement consists of the Face Page *and* the Rental Jacket. According to Sixt, because Florida law allows for incorporation-by-reference, the Face Page incorporated the Rental Jacket and all its terms. Therefore, if, as Sixt argues, the Face Page properly incorporated the Rental Jacket, then the Rental Agreement consists of *both* the Face Page and the Rental Jacket, and Sixt would have had a contractual right to charge the fees.

"It is a generally accepted rule of contract law that, where a writing expressly refers to and sufficiently describes another document, that other document, or so much of it as is referred to, is to be interpreted as part of the writing." *OBS Co. v. Pace Const. Corp.*, 558 So. 2d 404, 406 (Fla. 1990). But, further explicating this rule, under Florida law,

> [t]o incorporate by reference a collateral document, the incorporating document must (1) specifically provide that it is subject to the incorporated [collateral] document and (2) the collateral document to be incorporated must be sufficiently described or referred to in the incorporating agreement so that the intent of both parties may be ascertained.

*Spicer v. Tenet Fla. Physician Servs., LLC*, 149 So. 3d 163, 166 (Fla. 4th DCA 2014) (alteration in original).

In *Spicer*, the dispute over incorporation-by-reference involved (coincidentally) an arbitration clause. *Id.* at 165. The agreement the employee signed stated: "As a condition

of employment, you agree that any and all disputes regarding your employment with [the employer-defendant], including disputes relating to the termination of your employment, are subject to the Tenet Fair Treatment Process, which includes final and binding arbitration." *Id.* at 166. The Fair Treatment Process ("FTP") was not attached to the agreement, nor was there any direction to the employee as to how she could obtain or read it. *Id.* The last sentence of the employment agreement stated: "If you have any questions, please contact feel free to contact [sic] me in the Human Resources Department at [phone number]." *Id.* (alteration in original). Upon her filing a lawsuit against the employer, the employer moved to compel arbitration. *Id.* The employer argued the employee agreed to arbitration by signing the employment agreement, which incorporated the FTP. *Id.*

Florida's Fourth District Court of Appeal applied the two-prong test and determined that, while the first prong of incorporation was met, the second was not. *Id.* The court rejected the employer's response that, since "the employee asked no questions, raised no objections, and received an electronic copy of the FTP seventeen days [after signing the employment agreement]," she, in essence, waived any grievance that she did not receive the FTP simultaneously to signing the employment agreement. *Id.* at 167 (alteration in original). Significantly, the Florida court held "that merely providing a telephone number in a document for a party to call 'if you have any questions' is not sufficient to meet the requirement of giving the location of a document to be incorporated by reference." *Id.* at 167–68.

Here, based on the well-pleaded allegations in the Complaint, the Face Page contained even less than *Spicer*'s employment agreement. It made only a passing

reference to the Rental Jacket, with nothing more—not even a gratuitous, open-ended invitation to contact a human resources-like division with any questions. While this is adequate to satisfy *Spicer*'s first prong, it is not nearly enough to satisfy the second. Assuming all of this is true, the Face Page's cursory reference to the Rental Jacket, on its own, cannot be a "sufficient description or reference" to the Rental Jacket to withstand a motion to dismiss.

In a case with remarkably similar facts, a sister district court went even further. *See Bacon v. Avis Budget Grp., Inc.*, 357 F. Supp. 3d 401 (D.N.J. 2018). In *Bacon*, the New Jersey district court, applying *Spicer*, wrote: "The plaintiff must receive an incorporated document, or else be given clear direction on how to access it, before signing the agreement that allegedly incorporates that extrinsic document." *Bacon*, 357 F. Supp. 3d at 424. Not only does the Court find *Bacon* highly persuasive, but the Court also agrees with *Bacon*'s interpretation and understanding of *Spicer*, which is the law in this state-law claim.

Whether the Face Page "sufficiently described" the Rental Jacket and, therefore, whether Calderon was deemed to have read and accepted the terms of the entire "Rental Agreement" is something properly left to the province of the factfinder. Based on the four corners of the Complaint, a reasonable trier of fact could find that Calderon was not provided with a "sufficient description" of the Rental Jacket prior to his signing the Face Page. Accordingly, the Motion to Dismiss as to Count II is **DENIED**.

## C.    Calderon's FDUTPA Claim

In Count I, both Calderon and Marin "on behalf of all classes" bring a claim for violation of FDUTPA. Sixt moves to dismiss Calderon's claim because he cannot allege or prove any of the elements for a FDUTPA claim. The Court disagrees.

"A consumer claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1338 n.25 (11th Cir. 2012) (quotation omitted). Stated otherwise, the law allows for a plaintiff to recover under FDUTPA if he proves he was injured "by an objectively deceptive act or statement." *State Farm Mut. Auto. Ins. Co. v. Performance Orthopaedics & Neurosurgery, LLC*, 278 F. Supp. 3d 1307, 1316 (S.D. Fla. 2017).

Here, taking the allegations in the Complaint as true, Calderon has stated a claim under FDUTPA. Under Florida law, "[a]n unfair practice is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003) (internal quotations omitted). The crux of his grievance alleges deceitful incorporation of the terms of the "Rental Jacket" into the "Face Page."

Sixt argues that there is nothing unfair or deceptive by the Face Page incorporating the terms of the Rental Jacket, even if Calderon did not read the latter prior to signing the former. This misses the point. True, as discussed above, Florida law allows for incorporation-by-reference of extra-contractual terms, *see OBS Co.*, 558 So. 2d at 406, and a reasonable trier of fact could find that the Face Page did, in fact, incorporate the Rental Jacket.

However, Calderon's FDUTPA claim is not based on the attempted incorporation of the Rental Jacket into the Face Page. Rather, Calderon's claim alleges that Sixt attempted to merge the two contracts *in order to* perpetuate their "systematic scheme" of charging customers fraudulent fees to bring in additional revenue. *See* Compl. ¶ 70 (DE [1]). Further, according to the Complaint, Sixt "repeatedly and uniformly mark[s] up loss of use and diminished value charges above the fair market value." (*Id.* ¶ 72). But for the incorporated terms of the "Rental Jacket," Sixt would not be contractually able to do so.

At the very least, dismissal based on these allegations would be improper because "[w]hether [specific] conduct constitutes an unfair or deceptive trade practice is a question of fact for the jury to determine." *State Farm Mut. Auto. Ins. Co.*, 278 F. Supp. 3d at 1316 (alteration in original). Like Count II, the Motion to Dismiss as to Count I is **DENIED**.

## III.    DISCUSSION ON THE ARBITRATION MOTION

In the Arbitration Motion, Sixt argues Marin agreed to arbitrate all his claims when he accepted the terms and conditions in the Terms of Use on Orbitz's website. In the alternative, Sixt argues Marin should be required to arbitrate his claims under the doctrine of equitable estoppel.

Marin responds the arbitration clause does not apply here for two reasons: First, Sixt is not a party to the Terms of Use and, therefore, cannot enforce the arbitration clause; and second, because the arbitration clause covers disputes only involving services provided by *Orbitz*—not *Sixt*—his claims are not within the scope of the arbitration clause.

## A.    Legal Standard on a Motion to Compel Arbitration

The Federal Arbitration Act's ("FAA"), *see* 9 U.S.C. §§ 1 *et seq.*, "'primary' purpose is to ensure that private agreements to arbitrate are enforced according to their terms." *Spirit Airlines, Inc. v. Maizes*, 2017 WL 4155476, at *2 (S.D. Fla. Sept. 19, 2017) (internal quotation omitted), *aff'd*, 899 F.3d 1230 (11th Cir. 2018). Federal policy favors arbitration. *Moses H. Cone Memorial Hosp. v. Mercury Contr. Co.*, 460 U.S. 1, 24 (1983) ("The [Federal] Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration . . . ."). To that end, according to the FAA, arbitration agreements "shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2.

However, "[a]rbitration is a matter of contract," *AT&T Techs. v. Communs. Workers of Am.*, 475 U.S. 643, 648 (1986), and the federal-policy presumption in favor of arbitration "does not apply to the determination of whether an arbitration agreement exists" in the first place. *Rensel v. Centra Tech, Inc.*, 2018 WL 4410110, at *10 (S.D. Fla. June 14, 2018). "The threshold question of whether an arbitration agreement exists at all is simply a matter of contract." *Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1329 (11th Cir. 2016). "Such a determination rests on the intent of the parties." *Seaboard Coast Line R. Co. v. Trailer Train Co.*, 690 F.2d 1343, 1348 (11th Cir. 1982) (citations omitted). For this, the Court must apply "ordinary state-law principles that govern the formation of contracts." *Am. Exp. Fin. Advisors, Inc. v. Makarewicz*, 122 F.3d 936, 940 (11th Cir. 1997). Under Florida law, to best effectuate the intent of the parties, it is the responsibility of the Court to enforce the contract according to the plain language of its terms. *Murley*

*v. Wiedamann*, 25 So. 3d 27, 29 (Fla. 2d DCA 2009) ("Words and phrases are given their common and ordinary meanings absent specific contractual definitions.").

Finally, whether parties intended to arbitrate their claims is made under a summary-judgment-like standard. As the Eleventh Circuit has stated, "a district court may conclude as a matter of law that parties did or did not enter into an arbitration agreement only if 'there is no genuine dispute as to any material fact' concerning the formation of such an agreement." *Bazemore*, 827 F.3d at 1333 (quoting Fed. R. Civ. P. 56(a)). The party moving to compel arbitration bears the burden "to prove the existence and terms of the contract it wishe[s] to enforce." *Rensel*, 2018 WL 4410110, at *14.

The Court agrees with Marin and finds the arbitration clause does not apply here for two independent reasons. First, Sixt is not a party to the Terms of Use, nor is it a third-party beneficiary entitled to enforce it. Second, even if it were a party to the Terms of Use, Marin's claims are outside the scope of the arbitration clause.

### B.      Parties to the Terms of Use

#### 1.      Sixt is not a party to the Terms of Use.

Sixt cannot enforce the arbitration clause in the Terms of Use for a very simple reason: It is not a party to the contract. The Court finds no need to resort to any rules of construction as the language of the Terms of Use is clear and unambiguous. *See Umbach v. Mercator Momentum Fund, L.P.*, 2007 WL 2915910, at *3 (S.D. Fla. Oct. 5, 2007).

The Terms of Use is a contract between the customer making the reservation (here, Marin) and *Orbitz*, not *Sixt*. The Court makes this finding for a number of reasons. First, the arbitration clause states, "*You and Orbitz* agree that any and all Claims will be resolved by binding arbitration, rather than in court." *See* Ex. 1 to Arbitration Mot. (DE [12-

1]) (emphasis added). Under a plain-and-common-sense construction of this clause, the second-person pronoun "you" clearly refers to the customer (again, in this case, Marin), not Sixt. Even if the term "you" applied to Sixt, that would render the parties to this arbitration clause as Sixt and *Orbitz*, not *the customer*.

Further, while the second-person pronoun "you" refers to the customer, the first-person pronouns used throughout the Terms of Use refer only to *Orbitz*. To be sure, Orbitz, as the drafter of this contract, specifically decided to define the term "we": "'Orbitz' or 'we' means Orbitz Worldwide, LLC, and its subsidiaries and Corporate Affiliates, including Travelscape, LLC." *See* Ex. 2 to Arbitration Mot. (DE [12-2]). Sixt has no corporate affiliation with Orbitz and they fail to satisfy this definition. The other first-person used in the Terms of Use is "us." In relevant part, the Terms of Use provides: "You and Orbitz agree that any and all Claims will be resolved by binding arbitration, rather than in court . . . . This includes any Claims you assert against **us** . . . ." (*Id.* (emphasis added)). But, again, applying the plain and ordinary meaning of the terms, "us" is simply a synonym of "we" and carries the same meaning as Orbitz's specifically defined term "we." *See State v. Davis*, 110 So. 3d 27, 31–32 (Fla. 2d DCA 2013) (construing "vessel" as having the same definition of "boat" as defined in the statute).

Thus, under no reasonable reading can it be said that Sixt was a party to the Terms of Use. Orbitz, the drafter of this contact, made its intention clear that the parties to the contract were Orbitz and the customer.

### 2. Sixt is not a third-party beneficiary to the Terms of Use.

Because Sixt is not a party to the Terms of Use, the only way it could invoke the arbitration clause is by being a third-party beneficiary. *See Mims v. Glob. Credit &*

*Collection Corp.*, 803 F. Supp. 2d 1349, 1355 (S.D. Fla. 2011). But, "[a] non-party is the specifically intended beneficiary only if the contract clearly expresses an intent to primarily and directly benefit the third party or a class of persons to which that party belongs." *Id.* Sixt insists it does.

Its primary argument is that the Terms of Use compels arbitration of "[a]ny and all Claims . . . you assert against . . . travel suppliers or any companies offering products or services through [Orbitz], including Suppliers (which are beneficiaries of this arbitration agreement)." *See* Ex. 2 to Arbitration Mot. (DE [12-2]). Sixt insists it is a "supplier" under the Terms of Use. The Court disagrees.

Once again, the Terms of Use provided a specific definition: "'Supplier' means Orbitz's licensors, suppliers, information providers, and travel and leisure service providers." (*Id.*). This alone might support Sixt's argument. However, the Terms of Use provides *another* term-and-definition that the Court thinks more appropriately fits Sixt: "'Travel Services' means the airline travel, hotel accommodation, *car rental*, ground transportation, tours, theater tickets, attractions, travel insurance, and other items available through the Services." (*Id.* (emphasis added)). And the arbitration clause is devoid of any mention of "Travel Services."

To read the Terms of Use according to Sixt's pleasure would be to cherry-pick, applying only the provisions that best fits its argument. The Court declines to take this approach. The Court reads the Terms of Use as a whole and cannot find a way to read it such that Sixt would fit under the term "Suppliers" when it undeniably fits under the term "Travel Services."

## C.     Scope of the Claims Under the Terms of Use

Finally, even if Sixt were a third-party beneficiary to the Terms of Use and entitled to invoke it, "[a]n arbitration clause covers only the claims the parties intended it to cover." *Bullard v. Capital One, F.S.B.*, 288 F. Supp. 2d 1256, 1259 (N.D. Fla. 2003). The Court sees no reasonable way to interpret the Terms of Use as covering Marin's claims for two reasons.

First, the arbitration clause covers disputes between Orbitz's customers and Orbitz. Stated otherwise, the Court does not read the Terms of Use as covering disputes between customers of Orbitz and Sixt. Second, the Court does not read the Terms of Use as covering disputes related to the use of rental cars provided by Sixt. These are, indeed, tangentially the same issues immediately above concerning the parties to the Terms of Use.

Further, the arbitration clause applies only to "Claims":

> You and Orbitz agree that **any and all *Claims* will be resolved by binding arbitration, rather than in court.**

*See* Ex. 2 to Arbitration Mot. (DE [12-2]) (bolded emphasis in original, italicized emphasis added). "Claims" is a defined term:

> You agree to give us an opportunity to resolve any disputes or claims relating in any way to the Services, any dealings with our customer service agents, any services or products provided, any representations made by us, or our Privacy Policy ("Claims") . . . .

Thus, "Claims" in the defined-term sense include: "[A]ny disputes . . . arising out of or relating in any way to the Website, the[] Terms of Use, our Privacy Policy, and services or products provided, any dealing with [Orbitz's] customer service agents, or any representations made by [Orbitz]."

Marin's claims here do not fall qualify as any of these "Claims." The allegations against Sixt do not involve his use of Orbitz.com. Nor is he contesting any contractual provisions of the Terms of use, Orbitz's Privacy Policy, dealings with customer service agents, or representations made by Orbitz.

The only arguable way to interpret Marin's cause of action as falling within the scope of the Terms of Use is to understand it as a dispute "arising out of or relating in any way to . . . service or products provided . . . by Orbitz." *See* Ex. 2 to Arbitration Mot. (DE [12-2]). But, once again, the Court cannot adopt this reading of the Terms of Use because it belies the very definitions provided for the in the Terms of Use. To resolve this, the Court again returns to the Definitions section of the Terms of Use.

Orbitz provided a specific definition for the term "Services":

> "Services" means the Web sites, mobile applications, call center, agents, and other products and services *provided by Orbitz* . . . .

*See* Ex. 2 to Arbitration Mot. (DE [12-2]) (emphasis added). Simply, the term "Services" is not only limited to include a specific list of things, but expressly includes only those things "provided by Orbitz." And, critical to this action, it expressly does not include any services or products provided by third parties, such as Defendants. If this were insufficient, the Court further recognizes the last paragraph in the Definitions section, which reads accordingly:

> The terms "Services," "Marks," "Content," and "Travel Services" *do not include* the sites, applications, marks, content, *products or services that are provided by third parties*, and that are available through a link from the Services. Their use is subject to the terms set forth by their respective owners or operations.

*See* Ex. 2 to Arbitration Mot. (DE [12-2]) (emphasis added).

**D.     Doctrine of Equitable Estoppel**

Sixt's final argument that Marin should be required to arbitrate his claims under the doctrine of equitable estoppel is equally unpersuasive. This district recognizes two circumstances in which equitable estoppel affords a non-signatory to a contract the right to enforce its terms: first, "when the signatory to the contract relies on the terms of the contract to assert his or her claims against the non-signatory"; and second, "when the signatory raises allegations of concerted misconduct by both the non-signatory and one or more of the signatories to the contract." *Gunson v. BMO Harris Bank, N.A.*, 43 F. Supp. 3d 1396, 1401 (S.D. Fla. 2014). Neither circumstance applies here.

Under the first, "arbitration is appropriate when the signatory's claim against a non-signatory 'makes reference to' or 'presumes the existence of' the agreement." *Id.* According to Sixt, Marin's claims "rely upon and necessarily are related to" his "Reservation Agreement." *See* Arbitration Mot. 15 (DE [12]). But the "*Reservation* Agreement" Sixt refers to is the Terms of Use. While Marin's claims (like Calderon's claims) are undeniably related to the *Rental* Agreement, *see supra*, Part II.B., the Court concluded above they are not—in any way—related to the Terms of Use.

The second circumstance for equitable estoppel does not help Sixt, either. Under that theory, arbitration is appropriate when a party uses "certain provisions of the contract to [its] benefit to help establish [its] claim while also attempting to avoid the burdens of the other provisions." *Id.* While Marin is certainly "attempting to avoid the burdens" of the arbitration clause, the Court fails to see how Marin is attempting to use *any* of its provisions, much less using them to his benefit. Interestingly, upon a thorough review of

the Arbitration Motion, it appears Sixt has not provided any examples. Consequently, the Arbitration Motion is **DENIED**.

## IV.    CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that Defendants' Motion to Dismiss (DE [11]) is **DENIED** and Defendants' Arbitration Motion [DE [12]) is **DENIED**.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Florida, this 12th day of February 2020.

_____
RAAG SINGHAL
UNITED STATES DISTRICT JUDGE

Copies to counsel of record via CM/ECF