## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**PHILIPPE CALDERON, ANCIZAR MARIN,
and KELLI BOREL RIEDMILLER**
on behalf of themselves and all others similarly
situated,

Plaintiffs,

v.

**SIXT RENT A CAR, LLC,**

Defendant.

_____/

Civil Action No. 0:19-cv-62408-SINGHAL

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs, PHILIPPE CALDERON, ANCIZAR MARIN, AND KELLI BOREL RIEDMILLER ("Plaintiffs"), on behalf of themselves and all others similarly situated, allege the following based upon personal knowledge as to themselves, upon information and belief, and the investigation of their counsel as to all other matters, and bring this class action against Defendant, SIXT RENT A CAR, LLC ("Sixt" or Defendant"), as follows:

### I.     Nature of the Action

1.      Plaintiffs bring this class action against Sixt Rent A Car, LLC for its common course of unfair, deceptive, and unlawful conduct of uniformly and systematically imposing unauthorized repair charges on its rental car customers in breach of its rental contract with customers and in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*. ("FDUTPA").

2.      Sixt has organized a company-wide scheme to profit by systematically charging unfair, deceptive, and unauthorized Estimated Repair Costs and other sham fees not permitted by the Rental Agreement.  In a rental car transaction, customers are responsible for paying the "cost

of repair," but only where there is actual damage and where that damage was actually repaired. There can be no "cost of repair" if there were no vehicle repairs.

## II.     Jurisdiction and Venue

3.      The Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act 28 U.S.C. § 1332(d), because there are at least 100 Class Members in the proposed Class, the combined claims of proposed Class Members exceed $5,000,000, exclusive of interest and costs, and at least one Class Member is a citizen of a state other than Defendant's state of citizenship. This Court also has supplemental jurisdiction over the state law claims alleged herein pursuant to 28 U.S.C. § 1367.

4.      The Court has personal jurisdiction over Defendant because Sixt's principal place of business and headquarters is in Fort Lauderdale, Florida, and it is a Florida citizen subject to general jurisdiction in this State.

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because most of the events or omissions giving rise to Plaintiffs' claims occurred in this District. Specifically, Sixt's Collections Department is based in Fort Lauderdale, Florida, all of the repair invoices were sent from Florida, and all payments from consumers were sent to Florida.

## III.     The Parties

6.      Plaintiff, Philippe Calderon, is an individual resident and citizen of Florida and has been at all times relevant to this action.

7.      Plaintiff, Ancizar Marin, is an individual resident and citizen of Florida and has been at all times relevant to this action.

8.      Plaintiff Kelli Borel Riedmiller, is an individual resident and citizen of Florida and has been at all times relevant to this action.

9.      Defendant, Sixt Rent a Car, LLC, is a Delaware corporation and a United States subsidiary of its German parent company, Sixt SE.  Sixt Rent a Car, LLC is the primary entity responsible for Sixt's US vehicle rental operations, and is headquartered in Fort Lauderdale, Florida. Sixt Rent a Car, LLC is a citizen of Florida and Delaware.

## IV.      Factual Allegations

### A.  Sixt's Common and Uniform Rental Agreement

10.      Sixt used a rental agreement that was similar in all relevant aspects with all customers in this lawsuit. Sixt's Rental Agreement with Plaintiffs and Class Members consists of two separate documents which together constitute the entire agreement: (1) the Face Page Contract and (2) the Rental Jacket. The Rental Agreement is an adhesion contract, drafted by only Sixt.

11.      During the class period, Sixt's Face Page Contract was a standard form contract that was utilized in materially identical formats across all Sixt locations in the United States. Exhibit A, Plaintiff Calderon, Marin and Borel Riedmillers' Contracts' Face Pages.

12.      The Face Page Contract was electronically signed by Plaintiffs and the Class Members at the Sixt rental counter when picking up their rental vehicle.

13.      Sixt incorporates by reference its second contract, known as the "Rental Jacket," into the Face Page Contract through the following language:

> . . . By signing below, you agree to the Terms and Conditions printed on the Rental Jacket and to the terms found on this Face Page, which together constitute this Agreement. . .

Exhibit A.

14.      The Sixt "Rental Jacket" is a standard form, tri-fold pamphlet that was utilized uniformly by Sixt across the United States, during the class period.  Unlike the Face Page Contract that was signed by the customer, the Rental Jacket was used like an envelope, with the printed copy

3

of the signed Face Page Contract folded and inserted into the tri-folded Rental Jacket before both documents were handed over to the customer.  The material terms of the Rental Jacket are the same throughout the United States. Exhibit B, SIXT Rental Jacket.

15.     Sixt's Rental Jacket lists several fees and charges that Sixt can impose on customers for damage caused to the rental vehicle:

> **5. Responsibility for Damage or Loss; Reporting to Police; for Tolls and Parking Violations.** You are responsible for all damage to, and for loss or theft of, the Vehicle including damage caused by weather, road conditions and acts of nature, even if you are not at fault. **You are responsible for the cost of repair, or the actual cash retail value of the Vehicle on the date of the loss if the Vehicle is not repairable or if we elect not to repair the Vehicle. You are also responsible for Loss of Use (without regard to fleet utilization), Diminished Value, and our administrative expenses incurred processing a claim.** You must report all accidents and incidents of theft and vandalism to us and the police as soon as you discover them. You are responsible for paying the charging authorities directly all parking citations, toll fees, fines for toll evasion, and other fees, fines and penalties assessed against you, us, or the Vehicle during this rental.

Exhibit B (emphasis added).

16.     Critical to the claims in this action, Sixt's Rental Agreement states that the customer is "responsible for the cost of repair," "Loss of Use," "Diminished Value" and "administrative expenses incurred processing your claim."  These four categories of repair costs are at issue, here.

17.     Section 1 of the Rental Jacket is titled "Definitions" and further defines some of these terms:

> **"Loss of Use"** means the loss or our ability to use the Vehicle for any purpose (including, but not limited to non-rental uses such as general display of the Vehicle, display of the Vehicle for sale, non-revenue transportation by employees) due to damage to or loss of the Vehicle during your rental.
>
> **"Diminished Value"** means the difference between the value of the Vehicle immediately prior to damage or loss, and the value of the Vehicle after repair or replacement.

(Exhibit B, ¶ 1).

18.     The Rental Agreement does not define "cost of repair," and there is no language in the Rental Agreement that would entitle Sixt to charge the customer for the cost of repairs where there was no actual damage to the vehicle or where Sixt never actually made any repairs.

B.  **SIXT'S FLORIDA HEADQUARTERS AND CLAIMS DEPARTMENT**

19.     Sixt's North American headquarters and its Claim Department are located in Fort Lauderdale, Florida.

20.     Sixt's Florida Claims Department makes the decision on whether or not to charge a customer for damage to a rental vehicle.

21.     Sixt's Florida Claims Department calculates the amount of each of the charges set forth in the Collection Letters and Damage Invoices sent to customers for payment of alleged damage to rental vehicles.

22.     Sixt's Florida Claims Department orders Repair Estimates from third parties used to calculate Estimated Repair Costs sought from customers.

23.     All Collection Letters sent by Sixt's Florida Claims Department on Sixt letterhead lists only the Ft. Lauderdale address. (*See* Exhibit C, Plaintiff Calderon, Marin and Borel Riedmillers' Collection Letters).

24.     Sixt's Florida Claims Department issues a separate damage claim number for each damage claim made against a customer and uses that damage claim number, including electronically, to track all correspondence to and from the customer as well as any payments.

25.     Sixt's collection letters seeking to collect repair costs require all communications or inquires be made through its Fort Lauderdale Claims Department using the Damage Number provided by Sixt. Among other methods, Sixt tracks the collection efforts and claims information electronically, through its computer applications and systems.

C. **Sixt Estimated Repair Costs vs. Actual Repair Costs**

26.     A substantial percentage of customers who are sent Collection Letters for repair costs dispute causing any damage to the vehicle including Plaintiffs; however, regardless of whether there was any actual damage to the vehicle, it is unlawful for Sixt to charge and collect money from any customer where no actual repair is made.

27.      Sixt repair costs can be broken down into two categories: (1) Repair Costs Per Invoice and (2) Estimated Repair Costs.

28.     **Repair Cost Per Invoice:**  When a customer actually does "substantial damage" to a rental vehicle and repairs are actually made, Sixt properly passes those costs on to the customer through invoices listing the cost as: "Repair Cost per Invoice."  Substantial damage would include a scratch over 4 inches. There, the actual invoices from the body shop and/or parts suppliers engaged to repair the vehicle are used to determine the amount passed through to the customer.  In other words, "Repair Cost Per Invoice" reflects Sixt's actual out-of-pocket cost of repairing that particular rental vehicle.  Plaintiffs do not challenge Sixt's Repair Cost Per Invoice as they reflect actual out-of-pocket losses by Sixt, supported by third-party invoices.

29.     For example, Plaintiff Marin was charged by Sixt for replacing the windshield of his rental vehicle.  His Damage Invoice and Collection Letter from Sixt sought to collect "Repair Cost Per Invoice," which is an example of a legitimate repair cost supported by the Rental Agreement because it reflects Sixt's actual cost of repair.

30.     **Estimated Repair Costs:**  Customers are charged "Estimated Repair Costs" when Sixt alleges the customer damaged the vehicle, but does nothing to actually repair the vehicle. Because the vehicle is not actually repaired, there are no invoices from body shops or parts suppliers documenting any repair or the true cost of repair.  A common example is where there is a tiny

scratch smaller than 4 inches. In this situation, Sixt hires a third party to generate a Repair Estimate based solely upon photographs provided by Sixt.

31.     The Doan Group is Sixt's estimator of choice.  The Doan Group charges an Appraisal Fee of approximately $25 for preparing each estimate.  This Appraisal Fee (or sometimes listed as Engineer Fee) is passed on to the customer.  For this reason, customers charged for Estimated Repair Costs actually pay $25 more than those customers who are charged for repairs that are actually made.

32.     Sixt used two different terms in its Damage Invoices describing its Estimated Repair Costs: "Repair Cost Per Estimate," and "Repair Cost Per Engineer Report." These terms mean the same thing – that the repair costs being charged and collected are only estimated because Sixt did not actually repair the vehicle.

33.     The Rental Agreement states that customers are responsible for "repair costs," thus, Sixt breaches its own contract by charging for Estimated Repair Costs because there can be no "repair cost" if there is no repair.

34.     When Sixt collects Estimated Repair Costs from its customers, it keeps the entire amount as hidden profit.  It never tells the customer that it is not going to repair the vehicle. To the customer, these Estimated Repair Costs deceptively appear to be pass-through charges that Sixt has paid, or will pay, to repair the vehicle, with the amounts being passed through to the rental customer allegedly responsible for the damage.

35.     Likewise, the manner in which Sixt calculates "Loss of Use," "Diminished Value" and "Administration Fees" also violates Sixt's own Rental Agreement.

36.     A review of each Plaintiff's Repair Costs and related fees shows how these Estimated Repair Costs are unfair and deceptive.  The same itemizations reflecting Estimated Repair Costs are readily available for all members of the Class within Sixt's electronic system.

**D.  Plaintiff Calderon's Sixt Rental**

37.     On April 1, 2016, Plaintiff Calderon rented a vehicle from Sixt at one of its Miami locations.  Plaintiff Calderon signed an electronic signature device that served as acceptance of the standard form Face Page Contract, which is part of Sixt's standard operating policy. Exhibit A.

38.     In addition to paying the cost of the rental, Plaintiff Calderon purchased Rental Car Insurance sold by Sixt as "Partial Damage Waiver" for a daily rate of $9.99, for his three-day rental ($29.97 total).

39.     Plaintiff Calderon was also provided a Sixt Rental Jacket, with his signed Face Page placed inside, which contained standardized terms regarding repair costs for damaged vehicles.

40.     Mr. Calderon was rented a Mercedes Benz Metris van.

41.     On April 4, 2016, Plaintiff Calderon returned his Sixt rental vehicle in the same condition as when the vehicle was picked up, on April 1, 2016.

42.     On or about April 14, 2016, Plaintiff Calderon received communications from Sixt alleging that Mr. Calderon's rental vehicle had sustained damage while in his possession and enclosed a form to be filled out regarding the alleged damage.

43.     Mr. Calderon denied Sixt's damage allegations.

44.     On or around January 30, 2017, Mr. Calderon received a Collection Letter from Sixt, sent via email, seeking payment of $1,131.65 for alleged damage to the rental vehicle.

45.     The fees charged to Mr. Calderon were described in the Collection Letter as follows:

|                                      |              |
|--------------------------------------|--------------|
| Repair costs per Engineer Report:    | $667.24      |
| Administrative Fee:                  | $170.00      |
| Diminished Value:                    | $166.81      |
| Loss of Use:                         | $102.60      |
| Engineer Fee:                        | $ 25.00      |
| Total:                               | $1,131.65    |
| Partial Damage Waiver:               | -$500.00     |
| Total Amount Due:                    | $ 631.65     |

Exhibit C.

46.    The Collection Letter was sent from Sixt's Claims Department in Fort Lauderdale, Florida and asked that all payments be sent to that same address.

47.    To make it appear that the vehicle was actually going to be repaired, Sixt provided Mr. Calderon with an "Engineer Report" dated January 18, 2017, nine months *after* Mr. Calderon's rental.  The Doan Group also charged a $25 Engineer Fee that was passed on to Mr. Calderon.

48.    Mr. Calderon paid the first $500.00 of Sixt's charges through the Partial Damage Waiver coverage that he purchased at the time of his rental.

49.     Mr. Calderon was charged what appears to be a "pass through charge" of $667.24 for Estimated Repair Costs. Plaintiff Calderon, like any reasonable consumer, believed this amount reflected the actual repair costs charged and paid by Sixt for repairing the vehicle. Sixt did not disclose that it did not to make any repairs to the vehicle in connection with these alleged damages.

50.    However, discovery in this litigation revealed that, in truth, Sixt never made any repairs to this vehicle as a result of alleged damage incurred during Plaintiff Calderon's rental. Thus, Sixt was simply seeking $667.24 as additional profit, though guised as a pass-through fee for having allegedly repaired the vehicle.

51.    Plaintiff Calderon was also charged $166.81 for Diminished Value.  The Rental Jacket defines "Diminished Value" as "the difference between the value of the Vehicle immediately prior to damage or loss, and the value of the Vehicle after repair or replacement." Instead of

calculating Diminished Value through the methodology set forth in its own Rental Agreement, which Sixt, itself, drafted, Sixt calculates Diminished Value as 25% of the Repair Cost ($667.24 x .25 = 166.81). However, the cost of repair has nothing to do with the value of the vehicle. And, because the vehicle was not actually repaired, Sixt has no way of calculating Diminished Value under the methodology it set forth in the Rental Agreement.

52.     Plaintiff Calderon, like any reasonable consumer, believed that all charges, including the Diminished Value Charge, were calculated as indicated in the Rental Agreement. Because Sixt never discloses that it is not actually repairing the vehicle or how it actually calculates the charges, consumers have no way of knowing that the Diminished Value charge was not calculated in accordance with the Rental Agreement. As a result, the Diminished Value fee is unfair and deceptive.

53.     Plaintiff Calderon was also charged $102.60 for Loss of Use. Plaintiff's Rental Jacket defines "Loss of Use" as Sixt's inability to use the Vehicle due to damage caused to the vehicle. However, as noted above, the vehicle was never taken out of service to be repaired because Sixt did not actually repair the vehicle. Thus, there is no legitimate basis for charging Plaintiff Calderon for "Loss of Use" when the vehicle is never taken out of service for repairs.

54.     Plaintiff Calderon, like any reasonable consumer, believed that the Loss of Use charge reflected time the vehicle was unavailable for rent because it was being repaired. Because Sixt failed to disclose that it had not actually repaired the vehicle or how it calculates charges, consumers like Calderon have no way of knowing that the Loss of Use charge is not legitimate. As a result, the Loss of Use fee violates the Rental Agreement and is unfair and deceptive when charged on vehicles that are not actually repaired.

55.     Plaintiff Calderon was also charged a $170.00 Administrative Fee.  The Rental Agreement states that the customer is responsible for "administrative expenses incurred processing a claim." (Exhibit B, Rental Jacket).  However, neither Sixt nor the customer know what expenses, if any, were "incurred processing a claim." Though Sixt has robust electronic systems and applications, Sixt does not track the actual administrative expenses incurred for each claim nor does it have any reasonable or logical methodology for estimating administrative expenses incurred. Instead, Sixt's policy is to impose a tiered Administrative Fee based upon the amount of the alleged repair costs, which charges have no connection to any administrative work actually performed.

56.     Plaintiff Calderon, like any reasonable consumer, reasonably believed that the Administrative Fee imposed by Sixt was for the administrative expenses actually incurred by Sixt in processing its claim as stated in the Rental Agreement.  Because Sixt failed to disclose that its Administrative Fee is actually an arbitrary amount based upon the amount of the alleged repair cost and not administrative expenses or time "incurred processing the claim," customers have no way of knowing that the Administrative Fee violates the Rental Agreement. The fee is unfair and deceptive as it appears to be based upon the actual expenses "incurred" by administrative work.

**E.     Plaintiff Borel Riedmiller's Rental**

57.     On June 10, 2019, Plaintiff Borel Riedmiller rented a vehicle from Sixt at its Denver, Colorado location.  Plaintiff Borel Riedmiller signed an electronic signature device that served as acceptance of the standard form Face Page Contract, which is part of Sixt's standard operating policy. Exhibit A.

58.     Plaintiff Borel Riedmiller was also provided a Sixt Rental Jacket, which contained standardized terms regarding repair costs for damaged vehicles.

59.     After initially being provided a Kia Sorento with a key that did not work, Plaintiff Borel Riedmiller was given a Mercedes Benz GLC 300.

60.     On June 14, 2019, Plaintiff Borel Riedmiller returned the Sixt rental vehicle in the same condition as when the vehicle was picked up, on June 10, 2019.

61.     On or about June 18, 2019, Plaintiff Borel Riedmiller received communications from Sixt alleging that Plaintiff's rental vehicle had sustained damage while in her possession and enclosed a form to be filled out regarding the alleged damage.

62.     Plaintiff denied Sixt's allegations of damages.

63.     On or about July 3, 2019, Plaintiff Borel Riedmiller received a Collection Letter from Sixt, via email, seeking payment of $523.75 for alleged damage to the rental vehicle.

64.     The fees charged to Plaintiff Borel Riedmiller were described in the Collection Letter as follows:

| | |
|---|---|
| Estimate of Repair: | $365.00 |
| Administrative Fee: | $ 45.00 |
| Diminished Value: | $ 91.25 |
| Estimate/ Appraisal Fee: | $ 22.50 |
| Total: | $523.75 |

 Exhibit A.

65.     The Collection Letter was sent from Sixt's Claims Department in Fort Lauderdale, Florida and asked that all payments be sent to that same address.  The Collection Letter stated that "based on the supporting documentation, we are charging you for the full costs of the damages which is detailed on the attached paperwork."   (Exhibit D – Plaintiff Calderon and Borel Riedmillers' Doan Reports).

66.     The "attached paperwork" was a Repair Estimate from the Doan Group. In the "attached paperwork," the Doan Group also charged a $22.50 Estimate/Appraisal Fee that was passed on to Plaintiff Borel Riedmiller as justification for the charges being imposed.

67.     Although disputed, to protect Plaintiff's interests, Sixt was paid in full for the charges imposed on Plaintiff Borel Riedmiller.

68.     However, Plaintiff Borel Riedmiller was charged what appears to be a "pass through charge" of $365.00 for Estimated Repair Costs.  Plaintiff Borel Riedmiller, like any reasonable consumer, believed that this amount reflected the actual repair costs charged and paid by Sixt or to be paid by Sixt for repairing the vehicle.  Sixt did not disclose that, in fact, it did not make any repairs to the vehicle in connection with these alleged damages.

69.     However, discovery has revealed that Sixt never made any repairs to this vehicle as a result of alleged damage incurred during Plaintiff Borel Riedmiller's rental.  Thus, Sixt was simply seeking $365.00 as additional profit but which appeared to Plaintiff Borel Riedmiller to be a pass-through fee for repairing the vehicle.

70.     Plaintiff Borel Riedmiller was also charged $91.25 for Diminished Value.  Her Rental Jacket, which was drafted unilaterally by Sixt, defines "Diminished Value" as "the difference between the value of the Vehicle immediately prior to damage or loss, and the value of the Vehicle after repair or replacement." Instead of calculating Diminished Value through the methodology set forth in its own Rental Agreement, Sixt calculates Diminished Value as 25% of the Repair Cost ($365.00 x .25 = 91.25).  However, the cost of repair has nothing to do with the value of the vehicle.  And, because the vehicle was not actually repaired, Sixt has no way of calculating Diminished Value under the methodology set forth in the Rental Agreement.

71.     Plaintiff Borel Riedmiller, like any reasonable consumer, believed that the Diminished Value Charge was calculated as indicated in the Rental Agreement.  Because Sixt never discloses that it is not actually repairing the vehicle, consumers have no way of knowing that the Diminished Value charge was not calculated in accordance with the Rental Agreement.  As a result, the Diminished value fee is unfair and deceptive and violates the Rental Agreement.

72.     Plaintiff Borel Riedmiller was also charged a $45.00 Administrative Fee.  The Rental Agreement states that the customer is responsible for "administrative expenses incurred processing a claim." (Exhibit B, Rental Jacket).  However, neither Sixt nor the customer know what expenses, if any, were "incurred processing a claim." Sixt does not track the actual administrative expenses incurred for each claim nor does it have any reasonable or logical methodology for estimating administrative expenses incurred.   Instead, Sixt's policy is to impose a tiered Administrative Fee based upon the amount of the alleged repair costs.

73.     Plaintiff Borel Riedmiller, like any reasonable consumer, reasonably believed that the Administrative Fee imposed by Sixt was for the administrative expenses actually incurred by Sixt in processing its claim, as stated in the Rental Agreement.  Because Sixt failed to disclose that its Administrative Fee is actually an arbitrary amount based upon the amount of the alleged repair cost and not administrative expenses or time "incurred processing the claim," customers have no way of knowing that the Administrative Fee violates the Rental Agreement. The fee is unfair and deceptive as it appears to be based upon the actual expenses "incurred," though it is not.

### F.     Plaintiff Marin's Sixt Rental

74.     On March 5, 2019, Plaintiff Marin rented a vehicle from Sixt at its Phoenix Sky Harbor International Airport location.  Plaintiff Marin signed an electronic signature device that

served as acceptance of the standard form Face Page Contract, which is part of Sixt's standard operating policy. Exhibit A.

75.     Plaintiff Marin was also provided a Sixt Rental Jacket which contained standardized terms, drafted by Sixt, regarding repair costs for damaged vehicles.

76.     On March 7, 2019, Plaintiff Marin returned the Sixt rental vehicle in the same condition as when the vehicle was picked up, on March 5, 2019.

77.     On or about March 12, 2019, Plaintiff Marin received communications from Sixt alleging that Plaintiff's rental vehicle had sustained damage while in his possession and enclosed a form to be filled out regarding the alleged damage.

78.     Plaintiff denied Sixt's allegations of damages.

79.     On or about April 16, 2019, Plaintiff Marin received a Collection Letter from Sixt, via email, seeking payment of $708.62 for alleged damage to the rental vehicle.

80.     The fees charged to Plaintiff Marin were described in the Collection Letter as follows:

| | |
|---|---|
| Repair Cost Per Invoice: | $519.00 |
| Loss of Use: | $114.62 |
| Administrative Fee: | $ 45.00 |
| Total: | $708.62 |

 Exhibit C.

81.     The Collection Letter was sent from Sixt's Claims Department in Fort Lauderdale, Florida and asked that all payments be sent to that same address.

82.     Unlike the other Plaintiffs, Sixt actually documented a repair of the windshield to Marin's rental vehicle. Without the necessity of consulting any other documents, the fact that the Collection Letter states "Repair Cost Per Invoice" indicates that there was an actual repair made to

the rental vehicle. The actual repair invoice of $519.00 reflects Sixt's actual out of pocket costs. Thus, Marin and similarly situated class members do not challenge the repair costs or the loss-of-use charge.

83.     However, Plaintiff Marin was also charged a $45.00 Administrative Fee.  The Rental Agreement states that the customer is responsible for "administrative expenses incurred processing a claim." (Exhibit B, Rental Jacket).

84.     Plaintiff Marin and similarly situated Class Members seek only to recover a refund of the Administrative Fee.  Neither Sixt nor the customer know what expenses, if any, were "incurred processing a claim." Though it has robust electronic capabilities, Sixt does not track the actual administrative expenses incurred for each claim nor does it have any reasonable or logical methodology for estimating administrative expenses incurred.  Instead, Sixt's policy is to impose a tiered Administrative Fee based upon only the amount of the alleged repair costs.

85.     Plaintiff Marin, like any reasonable consumer, reasonably believed that the Administrative Fee imposed by Sixt was for the administrative expenses actually incurred by Sixt in processing its claim as stated in the Rental Agreement.  Because Sixt failed to disclose that its Administrative Fee is actually an arbitrary amount based upon the amount of the alleged repair cost and not administrative expenses or time "incurred processing the claim," customers have no way of knowing that the Administrative Fee violates the Rental Agreement. The fee is unfair and deceptive as it appears to be based upon the actual expenses "incurred."

**V.     Class Action Allegations**

86.     Plaintiffs seek to bring this case as a class action, pursuant to Rule 23 of the Federal Rules of Procedure. The proposed class (the "National Class") is defined as follows:

**All Sixt customers in the United States who were sent collection letters and damage invoices for repairs to rental vehicles that included a charge for**

16

**Estimate of Repair, Administrative Fee, Diminished Value and/or Estimate/Appraisal Fee between September 26, 2014 and October 31, 2019.**

Excluded from the Class are class members whose Sixt Rental Agreement contains an arbitration clause, and class members who booked their Sixt rental through third-party reservation sites Priceline.com and Expedia.com.

87.     Also, expressly excluded from the Class are: any Judge presiding over this action and members of their staff and immediate family members; and all persons who properly execute and file a timely request for exclusion from the Class.

88.     Plaintiffs reserve the right to amend the Class definition at any time prior to the class certification stage of the litigation if further investigation and discovery indicates that the class definitions should be narrowed, expanded, or otherwise modified.

89.     All class members are collectively referred to as the "Class," or "class members" unless specifically stated otherwise.

90.     The statute of limitations for the FDUTPA claims is four years prior to the date of filing of the original complaint, and five years for the breach of contract claim.

91.     Plaintiff Borel Riedmiller's claims relate back to the filing of the original complaint since they arise out of the same nucleus of operative facts.

## Rule 23(a) Criteria

92.     **Numerosity.** The exact number of Class Members is unknown as such information is in the exclusive control of Defendant. However, Plaintiffs believe the Class consists of thousands of consumers, geographically dispersed throughout the United States, and at least one thousand Sixt consumers with damage claims within the state of Florida, making joinder of all Class Members impracticable.  Class Members are ascertainable from a review of Sixt's business records, including

its electronic software and applications, which identify customers by individual damage claim numbers.

93.     **Commonality.** Common questions of law and fact affect the right of each Class Member and common relief by way of damages is sought for Plaintiffs and Class Members. The harm that Sixt has caused or could cause is substantially uniform with respect to Class Members. Common questions of law and fact that affect the Class Members include, but are not limited to:

(a)     Whether Sixt has violated the Rental Agreement by charging for Estimated Repair Costs when the vehicle is not repaired;

(b)     Whether Sixt's practice of charging Fees that are neither authorized in the Rental Jacket's Terms and Conditions nor the Face Page Contract violates the Florida Unfair and Deceptive Trade Practices Act because the amounts are not owed;

(c)     Whether charging fees for Estimated Repair Costs, appraisal fees, loss of use, diminished value, and administrative fees is an unfair and deceptive practice when the vehicles are not actually repaired and Sixt has never paid for the alleged damage;

(d)     Whether Sixt marks up what appear to be pass-through charges and fees imposed in connection with repairing rental vehicles in violation of the FDUTPA;

(e)     Whether the members of the Class have sustained damages and, if so, the proper measure of such damages and whether injunctive and declaratory relief should issue.

Commonality can be shown because the claims are based upon the common business practices of Sixt surrounding how it handles damage claims.  The case has two main legal issues. The first issue is whether Sixt can contractually charge for Estimated Repair Costs as opposed to actual repair costs under the adhesion, Rental Agreement that it unilaterally drafted.  Plaintiffs take the position that Sixt is only allowed to charge for its actual out-of-pocket repair costs.  Sixt insists that its Rental Agreement does not require that the vehicle actually be repaired in order for it to charge a customer for damage. Regardless which party prevails, the contract language is the same for all members of the class and must be construed in favor of the non-drafter – here, Plaintiffs. The second broad issue is whether Sixt can charge for Loss of Use, Diminished Value and Administrative Fees in a manner inconsistent with how such fees are defined in the Rental Agreement that Sixt unilaterally drafted.  Plaintiffs also contend that the same fees are unfair and deceptive because they appear to be pass-through charges paid or to be paid by Sixt when they are actually a form of undisclosed profit.  These claims also turn on common evidence because they all stem from Sixt's business practices applying such fees and how they are calculated, and not on individual circumstances surrounding each damage claim.

94.     **Typicality.** The claims and defenses of the representative Plaintiffs are typical of the claims and defenses of the Class because they were all charged at least one Fee that was not authorized by their Rental Agreement with Sixt.  Additionally, Sixt has uniformly invoiced Plaintiffs for what appear to be pass-through fees that Sixt has paid or will pay to have the rental vehicle repaired.  However, the vehicles of Plaintiff Calderon and Plaintiff Borel Riedmiller were not actually repaired.  Sixt was attempting to collect these amounts as additional undisclosed profit. Because Sixt did not disclose that Estimated Repair Costs were imposed when it decided not to repair the vehicles, the charges appear to be legitimate costs incurred or to be incurred by Sixt.

Similarly, all Plaintiffs, including Marin, were charged for an Administrative Fee that was not calculated from the time "incurred processing the claim" as required by the Rental Agreement. Thus, Plaintiffs have suffered damages of the same type and the same manner as the Class Members they seek to represent because Sixt uses standard formulas for calculating all of these fees. There is nothing peculiar about Plaintiffs' claims that would make their claims materially different from the class members they seek to represent. Accordingly, Plaintiffs' claims are typical of the claims of all other Class Members.

95.     **Adequacy of Representation.** The representative Plaintiffs will fairly and adequately represent class members and their claims as well as protect the interests of all Class Members. First, Plaintiffs have hired attorneys who are experienced in prosecuting class action claims within this state and across the United States, and who will adequately represent the interests of the Class. Second, Plaintiffs have no conflict of interest that will interfere with the maintenance of this class action as their claims are the same as the Class Members they seek to represent.

## Rule 23 (b) Criteria

96.     The common questions of law and fact set forth herein predominate over any questions affecting only individual Class Members. Specifically, there are three predominant common questions in this case: (1) whether the language of the Rental Agreement unilaterally drafted by Sixt allows Sixt to charge for Estimated Repair Costs, loss of use, diminished value, and administrative fees related to vehicles that are not repaired; (2) whether Sixt's Estimated Repair Costs, Loss of Use Fee, Diminished Value, and Administrative Fee appear to be pass-through charges that Sixt has paid or will pay to repair the damaged vehicle, when in reality the vehicle is not repaired and Sixt simply retains the payments as additional profit; (3) whether Sixt can lawfully charge Diminished Value, Loss of Use, and Administrative Fees in ways that violate the Rental

Agreement it unilaterally drafted, and whether imposing these fees in such a manner is unfair and deceptive; and (4) whether amounts charged for Estimated Repair Costs, loss of use, diminished value and administrative fees are properly due and owing where Sixt did not have any repair costs. These predominating common issues turn on common evidence stemming from the way Sixt chooses to calculate, disclose and charge for damages allegedly made to rental vehicles.  A class action provides a fair and efficient method for the adjudication of this controversy for these reasons and is superior to the alternative methods involved in individual litigation.

97.    Although the Class is numerous enough to meet the numerosity requirement, proposed classes do not create manageability problems because the claims turn on common legal determinations based on Sixt's calculation methods and collection letters.  There are no unusual legal or factual issues that would create manageability problems as the issues turn on interpretation of Sixt's standard form Rental Agreement.

98.    Prosecution of separate actions by individual members of the Class would create a risk of inconsistent and varying adjudications against Defendant when confronted with incompatible standards of conduct.

99.    Despite the costly nature of the fees charged to Plaintiffs and Class Members, the claims of the individual Class Members are, nevertheless, small in relation to the expenses of individual litigation, making a class action the only procedural method of redress in which Class Members can, as a practical matter, recover their damages and stop the unfair and deceptive practices at issue.

100.    For Plaintiffs and Class Members who refused to pay Sixt for the unlawful fees and markups they were billed for, injunctive relief under 23 (b)(2) is proper because Sixt has acted or refused to act on grounds that apply generally to the class, so that final declaratory and injunctive

relief is appropriate with respect to the class as a whole to prevent further harm from repetitive deceptive and unfair billing of unauthorized charges from Sixt, and to eliminate the outstanding amounts allegedly owed or threatened to be turned over to collections.

## VI.   CAUSES OF ACTION

### COUNT I
**Breach of Contract**
**(On Behalf of the Non-Repair Class and Unauthorized-Fee Class)**

101.    Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 100 as if set forth fully herein.

102.    Plaintiffs and Class Members entered into materially identical Face Page Contracts with Sixt when they picked up their rental vehicles. Exhibit A.  The Terms and Conditions set forth in the Face Page Contract are, therefore, binding on both Sixt and all Class Members, including Plaintiffs.

103.    The Face Page contract for Plaintiffs and all class members incorporates the Rental Jacket and the two documents together form the Rental Agreement between Sixt and its customers.

104.    The Rental Agreement states that customers are "responsible for the cost of repair, or the actual cash retail value of the Vehicle on the date of the loss if the Vehicle is not repairable or if we elect not to repair the Vehicle. You are also responsible for Loss of Use (without regard to fleet utilization), Diminished Value, and our administrative expenses incurred processing a claim." Exhibit B, Rental Jacket Paragraph 5.

105.    The Rental Agreement states that "Diminished Value" means the difference between the value of the Vehicle immediately prior to damage or loss, and the value of the Vehicle after repair or replacement."   Exhibit B, Rental Jacket Paragraph 1.

106.     The Rental Agreement states that "Loss of Use" means the loss or our ability to use the Vehicle for any purpose (including, but not limited to non-rental uses such as general display of the Vehicle, display of the Vehicle for sale, non-revenue transportation by employees) due to damage to or loss of the Vehicle during your rental."   Exhibit B, Rental Jacket Paragraph 1.

107.     Sixt breached its Rental Agreement by charging Plaintiffs Calderon and Borel Riedmiller and members of the class for Estimated Repair Costs where the vehicle is not repaired as the contract only permits Sixt to be reimbursed for the "cost of repair," and there can be no cost if there is no repair.

108.     Sixt also breached its Rental Agreement by calculating Diminished Value as 25% of the Repair Cost when the contract Sixt unilaterally drafted requires Diminished Value to be calculated as "the difference between the value of the Vehicle immediately prior to damage or loss, and the value of the Vehicle after repair or replacement."

109.     Even when Sixt actually repairs the vehicle, it uniformly imposes a Diminished Value Fee as 25% of the Repair Invoice rather than as required by the definition Sixt drafted in the Rental Agreement.

110.     For those customers whose rental vehicles are not repaired, it is impossible for Sixt to calculate Diminished Value as required by the Rental Agreement because the value of the vehicle after repair cannot be calculated.  As such, no Sixt customer charged for Estimated Repair Costs can be charged any amount for Diminished Value without violating the Rental Agreement.

111.     Additionally, Sixt breached the Rental Agreement by charging a Loss of Use fee to Plaintiff Calderon and members of the class because the vehicles were never taken out of service to be repaired as required by the Rental Agreement.  There can be no Loss of Use under Sixt's Rental Agreement definition if the vehicle was never repaired and, thus, never taken out of service.

112.     As a direct and proximate result of Sixt's breach, Plaintiffs and Class Members have been damaged by being charged and by paying amounts that they are not contractually required to pay under the Rental Agreement and for paying Diminished Value and Loss of Use Fees that are not authorized by the Rental Agreement.

113.     Plaintiffs seek a declaration as to their rights and obligations and the rights and obligations of the class under the Rental Agreement and an injunction prohibiting Sixt from continuing to seek payment for Estimated Repair Costs and Fees that violate the Rental Agreement.

### COUNT II
**Violation of the Florida Deceptive and Unfair Trade Practices Act,**
**FLA. STAT. § 501.201, *et seq.***
**Rental Jacket Fees**
**(On Behalf of the Estimated Repair Costs)**

114.     Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 through 100 above, as if set forth herein in full.

115.     Sixt has engaged in unfair and deceptive practices by sending letters to its customers within the Class charging Estimated Repair Costs and other Fees:

A.     **Estimated Repair Costs:** Sixt demands payment for   Estimated Repair Costs pursuant to the "rental agreement."   The statement is untrue, unfair and deceptive because the Rental Agreement only permits Sixt to charge consumers for actual repair costs.  If there is no repair, there are no repair costs.

B.     **Diminished Value:** Sixt demands payment for Diminished Value.  This charge  is deceptive and unfair because the amount does not reflect the actual diminished value. Rather than an actual diminished value, the amount charged is simply 25% of whatever Repair Cost is demanded.

C.    **Administrative Fee:**  Sixt demands an Administrative Fee to all Class members. The Rental Agreement provides that this Fee is for "administrative expenses incurred" processing a claim. The Administrative Fee is a tiered charge that increases concomitant to the alleged Repair Costs.  This is unfair and deceptive because the Rental Agreement provides that customers are only obligated for Sixt's "administrative expenses incurred" processing a claim.

D.    **Loss of Use:**  Sixt demands payment for Loss of Use which is defined as Sixt's inability to use or rent the vehicle. This is unfair and deceptive where no repairs were actually made because the vehicle is not actually taken out of service to be repaired.

116.    Because Plaintiff Calderon and Plaintiff Borel Riedmiller were charged for Estimated Repair Costs and Diminished Value for rental vehicles that were never repaired, Sixt's demands for payment caused them damages and/or they are aggrieved by these deceptive acts or unfair practices.

117.    Plaintiffs Calderon, Borel Riedmiller, and Marin were all charged Administrative Fees, and Sixt's demand for payment caused them damages and/or they were aggrieved by these deceptive acts or unfair practices.

118.    Plaintiff Calderon was charged for Loss of Use although the vehicle he rented was never taken out of service to be repaired.  Sixt's demand for payment caused him damages and/or he was aggrieved by this deceptive act or unfair practice.

119.    Reasonable consumers, like Plaintiffs and Class Members, would be deceived by Sixt's conduct in charging these four unfair and deceptive fees.

120.     As a result of Sixt's unconscionable, unfair and deceptive conduct alleged herein, Plaintiffs Borel Riedmiller and Marin and all Class Members suffered actual damages within the meaning of Fla. Stat. § 501.211(2) because they paid one or more of the four unfair and deceptive fees at issue.

121.     Plaintiff Calderon refused to pay Sixt for the unauthorized fee's imposed on him but he and Plaintiffs Marin and Borel Riedmiller are "aggrieved" persons as defined by FDUTPA Fla. Stat. § 501.211(1).  Plaintiffs are entitled to bring an action for a declaration that Sixt's conduct in charging these Fees is unfair and deceptive and requesting an injunction prohibiting Sixt from continuing to engage in the unlawful conduct.  Despite this lawsuit, Sixt continues to send bills and impose charges consistent with these allegations and an injunction is necessary to stop future harm.

122.     Pursuant to Fla. Stat. § 501.211(1), Plaintiff Calderon's credit scores are jeopardized due to the unfair and deceptive fees charged to him and injunctive relief is necessary to prevent Sixt from further billing and pursuing collection efforts against him and others.

123.     Plaintiffs also seek attorney fees and court costs pursuant to FDUTPA Fla. Stat. § 501.211(2).

**COUNT III**
**Violation of the Florida Deceptive and Unfair Trade Practices Act,**
**FLA. STAT. § 501.201, *et seq.***
**(On Behalf of the Pass-Through Fee Class)**

124.     Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 100, as if set forth fully herein.

125.     When Sixt Plaintiffs received a Collection Letter, Damage Invoice and Repair Estimate from Sixt, they reasonably believed that Sixt either actually incurred or will incur those repair costs.  Because the Repair Estimate is from a third party it appears that Sixt either did or will pay these amounts to others to repair actually damaged vehicles.

126.     This practice of presenting the Repair Estimates as legitimate repair costs is unfair and deceptive based upon three parts of Sixt's standard form documents that are sent in every damage claim.

127.     First, when Sixt elects <u>not</u> to repair a vehicle, it provides the customer with a repair Estimate provided by the Doan Group, which purports to detail the amount that Sixt will spend to have the vehicle repaired.  (Exhibit D).  At the bottom, the Estimate states "This is a preliminary estimate.  Additional changes to the estimate may be required for the actual repair."  A reasonable consumer would read this sentence to mean that Sixt was going to actually repair the vehicle and would pay at least this amount to do so.

128.     Second, by charging the customer for Diminished Value in addition to Estimated Repair Costs, Sixt further implies that the vehicle has been or will actually be repaired.  The Rental Agreement defines "Diminished Value" as "the difference between the value of the Vehicle immediately prior to damage or loss, and the value of the Vehicle after repair or replacement." Thus, the only way Sixt could calculate Diminished Value under its own formula is to have the vehicle repaired so that the value before and after can be determined and the difference between the two values can be calculated.  In other words, because Diminished Value cannot be calculated without repairing the vehicle, the inclusion of this charge on the Damage Invoice leads a reasonable consumer to believe that the vehicle has been repaired.

129.     Third, by charging the customer for "Loss of Use" combined with a per day statement, Sixt implies that the vehicle was actually taken out of service to be repaired.  For example, Plaintiff Calderon's Damage Invoice included three (3) days at $34.20 per day.  A reasonable consumer would believe that the vehicle would be unavailable for rent during the three days taken to repair it.

130.    The above-described practice or course of conduct constitutes unconscionable acts or practices, and unfair or deceptive acts or practices within the meaning of Fla. Sta. § 501.204, *et seq*.

131.    These practices caused Plaintiffs and the Class to suffer damages because they paid or have been assessed for amounts in excess of the cost of repair, loss of use, diminution of value, appraisal/estimate fees, and administrative costs.

132.    Additionally, those Plaintiffs and Class Members that have yet to pay the amounts invoiced by Sixt for the contested charges are "aggrieved parties" within the definition or Fla. Stat. § 501.211(1), and are therefore, entitled to injunctive relief to stop Sixt's unfair and deceptive practices and any future attempt to assert the right to collect the charges.

**Prayer for Relief**

WHEREFORE, Plaintiffs pray that this case be certified and maintained as a class action and for judgment to be entered against Sixt as follows:

A.    Enter an order certifying the proposed Classes, designating Plaintiffs as the Class representatives, and designating the undersigned as Class counsel;

B.    Declaring that Sixt is financially responsible for notifying all Class Members;

C.    For economic and compensatory damages on behalf of Plaintiffs and all members of the Class;

D.    For actual damages sustained, as allowed by law;

E.    For declaratory and injunctive relief or such other equitable relief necessary to protect the aggrieved parties;

F.    For reasonable attorneys' fees and reimbursement of all costs for the prosecution of this action pursuant to the FDUTPA; and

G.      For such other and further relief as this Court deems just and appropriate.

## Jury Demand

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted this 1st day of March, 2022.

**VARNELL & WARWICK, P.A.**

/s/ Brian W. Warwick
Brian W. Warwick (FBN 0605573)
Janet R. Varnell (FBN 0071072)
Matthew T. Peterson (FBN 1020720)
Erika R. Willis (FBN 100021)
1101 E. Cumberland Ave., Ste. 201H, #105
Tampa, Florida 33602
Telephone: (352) 753-8600
Facsimile: (352) 504-3301
bwarwick@vandwlaw.com
jvarnell@vandwlaw.com
mpeterson@vandwlaw.com
ewillis@vandwlaw.com
kstroly@vandwlaw.com

**GORDON & PARTNERS, P.A.**

/s/ Steven G. Calamusa
Steven G. Calamusa, FBN: 992534
Geoff S. Stahl, FBN: 89240
Rachel A. Bentley, FBN: 106870
4114 Northlake Boulevard
Palm Beach Gardens, FL  33410
Telephone: (561) 799-5070
Facsimile: (561) 799-4050
scalamusa@fortheinjured.com
SGC.pleadings@fortheinured.com
gstahl@fortheinjured.com
GSS.pleadings@fortheinured.com
rbentley@fortheinjured.com

***Attorneys for Plaintiffs***